DIETZ, Judge.
Defendant Alison Herndon appeals from a domestic violence protective order entered at the request of her husband, Steven Herndon. The trial court found that Ms. Herndon was putting sleep-inducing drugs in her husband's food and then sneaking out to conduct an affair. The drugs incapacitated Mr. Herndon and led to a number of health issues, including rapid weight loss and morning vomiting.
On appeal, Ms. Herndon challenges the admission of texts and other information from her cellphone, which she alleges Mr. Herndon obtained by breaking through the phone's security features without her permission. As explained below, we hold that any error in the admission of this evidence was harmless because, even setting that evidence aside, there is ample competent evidence supporting the trial court's findings of fact. Those findings, in turn, support the trial court's conclusion that Ms. Herndon engaged in acts of domestic violence. Accordingly, we affirm the trial court's domestic violence protective order.
Facts and Procedural History
Plaintiff Steven Herndon and Defendant Alison Herndon are husband and wife and the parents of four minor children. On 21 May 2014, Mr. Herndon sought a domestic violence protective order against Ms. Herndon, alleging that she had caused or attempted to cause bodily injury to him and to their children. Specifically, Mr. Herndon alleged that his wife was putting sleep-inducing drugs in his food so that she could slip out of the house and meet a lover. Mr. Herndon alleged that the drugs made him ill and that, while he was incapacitated and his wife was out of the house conducting her love affair, the parties' children were left unsupervised.
On 10 September 2014, the trial court held a hearing on the matter. At the hearing, Mr. Herndon testified about the events that led to his request for a domestic violence protective order.
Mr. Herndon testified that, in early 2014, he began to experience strange episodes in which he would wake up in the morning with no recollection of having gone to bed, apparently having passed out at some point the previous evening. Mr. Herndon described one incident in which he "woke up and broke a full-length mirror" while stumbling in a haze in the middle of the night. He also discovered that his wife was mysteriously missing from the home.
Mr. Herndon also testified in detail about one particular incident in April 2014, when his wife strangely insisted that he eat mashed potatoes she had prepared for him. Mr. Herndon testified that his wife went "on and on and on about me eating the mashed potatoes." When the potatoes were ready to be served, Mr. Herndon observed his wife sticking her finger into his mashed potatoes and "swirling [it] around." He asked her, "what are you doing with your fingers in my mashed potatoes?" and she said she was "scooping them back on the plate." After eating the mashed potatoes, Mr. Herndon attempted to get up from the table but he "stumbled, could barely stand up, and ... everything was kind of fuzzy." He had to be helped to his seat to keep from collapsing.
Beyond these specific incidents, Mr. Herndon also testified about significant health issues he began to experience during this same timeframe, including a thirty-five pound weight loss and frequent early morning vomiting. He testified that, once he began to suspect his wife and she no longer had access to his food, these health issues went away.
Mr. Herndon also introduced texts and other information extracted from his wife's cellphone. Ms. Herndon sought to exclude that information on various evidentiary grounds, including that Mr. Herndon had broken through the cellphone's security without her permission to access the stored texts. The trial court overruled Ms. Herndon's objections and admitted the challenged evidence.
Ms. Herndon also testified at the hearing and admitted that she was having an affair during the time period in which her husband experienced the unusual blackouts and health issues. But before she took the stand, the following exchange occurred:
[DEFENSE COUNSEL]: Call Alison Herndon.
THE COURT: All right. Before we do that, let me make a statement. You're calling her. She ain't going to get up there and plead no Fifth Amendment?
[DEFENSE COUNSEL]: No, she's not.
THE COURT: I want to make sure that wasn't going to happen because you-somebody might be going to jail then. I just want to let you know. I'm not doing no Fifth Amendment.
[DEFENSE COUNSEL]: No.
THE COURT: Okay. Call your witness.
[DEFENSE COUNSEL]: Alison Herndon.
Ms. Herndon then took the stand and testified on a range of matters. When defense counsel concluded the direct examination, the trial court denied Mr. Herndon's counsel the opportunity to cross-examine her and instead directly asked Ms. Herndon a series of questions related to the texts recovered from Ms. Herndon's phone. In response to much of the trial court's questioning, Ms. Herndon responded with variations of "I don't recall" or "I don't remember." The trial court then noted that it found Ms. Herndon's testimony not credible.
The trial court entered a written domestic violence protective order and Ms. Herndon timely appealed. A divided panel of this Court vacated the trial court's order and remanded on the ground that the trial court's threat to jail Ms. Herndon if she invoked her Fifth Amendment rights was unconstitutional. Herndon v. Herndon , --- N.C. App. ----, 777 S.E.2d 141 (2015).
The Supreme Court reversed, holding that the trial court's threat to jail Ms. Herndon if she invoked her Fifth Amendment rights was not unconstitutional. Herndon v. Herndon , 368 N.C. 826, 834, 785 S.E.2d 922, 927 (2016). The Supreme Court remanded the case to this Court for "consideration of defendant's alternative bases for appeal." Id. at 835, 785 S.E.2d at 928.
Analysis
With the Fifth Amendment issue resolved by our Supreme Court, the only remaining issues in this appeal concern the trial court's admission of the evidence obtained from Ms. Herndon's cellphone. Ms. Herndon argues that all evidence gathered from her cellphone should have been excluded and that, without it, there was insufficient evidence to support the trial court's finding that Ms. Herndon committed an act of domestic violence. As explained below, we disagree and hold that any error by the trial court in admitting the challenged evidence was harmless.
When a victim of domestic violence moves for a protective order, if the trial court "finds that an act of domestic violence has occurred, the court shall grant a protective order restraining the defendant from further acts of domestic violence." N.C. Gen. Stat. § 50B-3(a). "Although N.C. Gen. Stat. § 50B-3(a) states that the trial court must 'find' that an act of domestic violence has occurred, in fact this is a conclusion of law." Kennedy v. Morgan , 221 N.C. App. 219, 223 n.2, 726 S.E.2d 193, 196 n.2 (2012). This Court reviews that conclusion of law to determine if it is supported by adequate findings of fact, and reviews those findings of fact to determine if they are supported by competent evidence in the record. Stancill v. Stancill , ---N.C. App. ----, ----, 773 S.E.2d 890, 892 (2015).
Here, the trial court expressly concluded that Ms. Herndon "committed acts of domestic violence against" her husband. The court based that conclusion on its findings (handwritten on the pre-printed DVPO form) that Ms. Herndon drugged her husband's mashed potatoes so that she could conduct an extramarital affair, and that the drugging also had occurred on previous occasions and made Mr. Herndon ill:
Tampering with p's mash potatos [sic ] and placing unknown but incapacitating substance in his food causing illness + incapacitation so that she could spend time w/ male friend-that this tampering w/ food/drink had occurred on numerous previous occasions w/o p's knowledge.
Even without the challenged evidence from Ms. Herndon's cellphone, there is ample competent evidence in the record to support the court's findings. These findings are based on Mr. Herndon's testimony that his wife once insisted that he eat mashed potatoes for dinner, that he saw her swirling her finger in the potatoes in a suspicious way, and that after eating the potatoes Mr. Herndon "stumbled, could barely stand up, and ... everything was kind of fuzzy."
Mr. Herndon also testified that he experienced this same, drug-induced feeling on other occasions, often passing out and then waking the next morning without any recollection of having gone to bed. On one occasion, Mr. Herndon woke in the middle of the night after crashing into a full-length mirror. He then discovered that his wife was missing.
Other competent evidence in the record also supports the trial court's findings. For example, Mr. Herndon testified that he began suffering health issues, such as rapid weight loss and early morning vomiting, during the time period when he observed his wife suspiciously touching his food. Those health issues went away after his wife no longer had access to his food. Finally, Ms. Herndon conceded in her testimony that she was having an affair during the relevant time period.
This evidence supports the trial court's findings in its order that Ms. Herndon intentionally drugged her husband without his knowledge, causing "illness" and "incapacitation." Those findings, in turn, support its conclusion that Ms. Herndon committed acts of "domestic violence," which is defined in section 50B-1(a) of the General Statutes to include "attempting to cause bodily injury, or intentionally causing bodily injury."
In sum, even if the Court disregards the challenged evidence obtained from Ms. Herndon's cellphone, the trial court's findings are supported by ample competent evidence in the record. Accordingly, any error in admitting the challenged evidence is harmless. See Williamson v. Williamson , 217 N.C. App. 388, 392, 719 S.E.2d 625, 627-28 (2011).
Conclusion
For the reasons set out above, we affirm the trial court.
AFFIRMED.
Report per Rule 30(e).
Judges BRYANT and STEPHENS concur.